IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| CHRISTOPHER HICKS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:24-cv-31 |
| | ) | |
| UNITED CLEANUP OAK | ) | |
| RIDGE, LLC d/b/a UCOR, | ) | (Jury Demand) |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

## NATURE OF THE CASE

Plaintiff Christopher Hicks, through counsel, brings this lawsuit against his former employer, United Cleanup Oak Ridge, LLC (UCOR), for violations of his rights protected by Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq., as amended by the Americans with Disabilities Act Amendments Act of 2008 (ADA), which prohibits employment discrimination based on disability, and the National Defense Authorization Act's Enhancement of Contractor Protection from Reprisal for Disclosure of Certain Information (NDAA-ECP or "NDAA"), 41 U.S.C. § 4712, which prohibits a contractor or subcontractor of the federal government from retaliating against an employee for making protected disclosures. UCOR violated the ADA when it discriminated against Mr. Hicks based on his disability, including failing to provide him with a reasonable accommodation, and when it retaliated against him and discharged him based on his disability and his protected activities. UCOR violated the NDAA when it discriminated against Mr. Hicks and discharged him in retaliation for his reports

of health and safety concerns at his work site on the Oak Ridge Reservation. Through this lawsuit, Mr. Hicks seeks redress for the harm and losses he sustained due to these violations of his rights.

## PARTIES

1. Plaintiff Christopher Hicks is a resident of Oak Ridge, Tennessee. He was employed by Defendant UCOR from May 2008 until UCOR discharged him on April 17, 2019.

2. UCOR is the lead cleanup contractor for the United States Department of Energy (DOE) on the Oak Ridge Reservation. UCOR has over 2,000 employees at that location.

3. UCOR can be served through its registered agent, CT Corporation, 300 Montvue Road, Knoxville, Tennessee 37919-5546.

4. UCOR was Mr. Hicks's employer within the meaning of the ADA, 42 U.S.C. §§ 2000e(b), 12111(5). UCOR is a government contractor and employed Mr. Hicks in a covered position within the meaning of the NDAA, 41 U.S.C. §§ 4712(a), 4712(c)(6).

## JURISDICTION AND VENUE

5. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343 because this action involves federal questions brought under the laws of the United States, namely the ADA, 42 U.S.C. § 12101 et seq., and the NDAA, 41 U.S.C. § 4712 et seq.

6. This Court has authority to grant equitable relief and monetary damages under 42 U.S.C. § 12117(a) and 41 U.S.C. § 4712(c).

7. Venue in the Eastern District of Tennessee, Northern Division at Knoxville, is appropriate pursuant to 28 U.S.C. § 1391(b) because UCOR does business within this district and the actions giving rise to this lawsuit occurred within this district.

## CONDITIONS PRECEDENT

8. Mr. Hicks timely filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) alleging that UCOR violated Title I of the ADA.

9. After investigating Mr. Hicks's claims against UCOR, the EEOC issued a determination favorable to Mr. Hicks, finding that UCOR violated the ADA when it denied Mr. Hicks reasonable accommodations, discharged him, and retaliated against him. After conciliation failed, the EEOC issued a Notice of Right to Sue on November 20, 2023. This Complaint is timely filed within ninety days of receipt of that notice.

10. During his employment, Mr. Hicks made protected disclosures as defined in the NDAA-ECP, 41 U.S.C. § 4712(a)(1). He filed a whistleblower complaint with the DOE's Office of Inspector General (OIG), *Id*., § 4712(b)(1).

11. The OIG issued an investigative report to management on June 15, 2023. Thereafter, the DOE Office of Hearings and Appeals (OHA) issued a decision on July 14, 2023, finding that Mr. Hicks had established his whistleblower claim under the NDAA, 41 U.S.C. § 4712, by presenting credible evidence about the protected disclosures he made about UCOR operations in 2018 and 2019, and by proving that his whistleblowing was a contributing factor in UCOR's decision to discharge him.

12. However, the DOE-OHA decision denied relief to Mr. Hicks by concluding that UCOR would have discharged Mr. Hicks anyway because of his disability, even though it found that his protected whistleblowing was a contributing factor in UCOR's discharge decision.

13. The DOE-OHA decision allowed UCOR to shirk its responsibility for illegal whistleblower retaliation. Evidence that UCOR discharged Mr. Hicks based on his disability (in violation of the ADA) coexists with, and does not rebut, evidence that UCOR discharged Mr. Hicks based on his protected disclosures in violation of the NDAA. Therefore, through this lawsuit, Mr. Hicks seeks to hold UCOR accountable for violating both statutes.

14. This Complaint is timely filed in this Court within two years of the decision issued on July 14, 2023, by the Department of Energy Office of Hearings and Appeals denying relief to

Mr. Hicks.

15. Mr. Hicks has fully exhausted his administrative remedies with the EEOC and DOE-OIG. All administrative conditions precedent to filing this lawsuit have been met.

**STATEMENT OF FACTS**

16. Mr. Hicks was employed by UCOR as a laborer from May 2008 until UCOR terminated his employment on April 17, 2019. He has over 20 years of experience in hazardous waste, asbestos, and radiation clean-up. He has worked as a laborer on various DOE sites, has held a Q clearance, was certified as an asbestos-competent supervisor, and has received extensive training and various certifications over the past 20 years.

17. Mr. Hicks has always had satisfactory work performance and met the expectations of his employers.

18. On October 19, 2017, Mr. Hicks sustained a work-related injury to his back, reported it through proper channels, filed a worker's compensation claim, and was referred to the UCOR Medical Department for evaluation. His doctor deemed him fit for duty but assigned temporary physical limitations restricting his work duties.

19. For the first few months after his injury, Mr. Hicks was restricted to lifting a maximum of 10 pounds and was instructed to avoid other movements such as pushing, pulling, and repetitive bending. An MRI showed mild degenerative disc changes. He continues to experience chronic back pain.

20. On July 10, 2018, when Mr. Hicks reached maximum medical improvement, his doctor assigned permanent restrictions due to his impairment. His permanent medical restrictions include alternating sitting and standing occasionally, no lifting greater than 10 pounds frequently, no lifting greater than 40 pounds maximum, and no prolonged bending over.

21. Laborers are not permitted to lift more than 30 pounds, so Mr. Hicks's 40-pound

4

permanent restriction should not have conflicted with his ability to perform that job function.

22. Mr. Hicks has a permanent physical impairment and chronic pain that substantially limits major life activities including, but not limited to, lifting, bending, walking, and standing. Mr. Hicks has a record of such an impairment and was regarded by UCOR as having such an impairment.

23. Despite his injury, impairment, chronic pain, and need for accommodation due to his medical restrictions, Mr. Hicks rarely took time off work because of his injury.

24. For eighteen months after his injury, including nine months after his doctor established permanent restrictions, Mr. Hicks successfully performed work for UCOR as a laborer.

25. There were numerous job positions and duties that Mr. Hicks could perform and did perform for UCOR within his medical restrictions.

26. Mr. Hicks's medical limitations became less restrictive over time from the date he was injured on October 19, 2017, until his doctor assigned permanent restrictions on July 10, 2018. UCOR accommodated his more restrictive limitations, as well as his permanent restrictions, for eighteen months after his injury but then discharged Mr. Hicks citing those same medical restrictions.

27. Specifically, on April 17, 2019, UCOR management told Mr. Hicks that it would no longer accommodate his permanent medical restrictions and terminated his employment.

28. In May 2017, before Mr. Hicks sustained a work-related back injury, he was working at the "1037" site and was encouraged to apply to the Waste Packaging Specialist (WPS) position by the Waste Operations Manager, Annette Ferrari. The position was higher-paying and physically less demanding than a laborer's position. After his job interview, Ms. Ferrari told him in July 2017 that he was next in line to be hired for a WPS job opening.

29. Waste Packaging Specialists were officially employed by UCOR subcontractors,

but all new hires had to be approved by UCOR.

30. In November 2017, Mr. Hicks received an offer letter for an open WPS position from subcontractor Value Added Solutions, Inc. The letter stated that the offer was conditioned on UCOR's approval of Mr. Hicks for the position. Shortly thereafter, Mike Ferrari, who worked for UCOR in Waste Packaging with Annette Ferrari, rescinded the offer to Mr. Hicks.

31. In early 2018, Mr. Hicks complained to his supervisor, UCOR Area Superintendent Dawn Mills, that he believed UCOR rescinded the offer for the WPS job because of his injury and medical restrictions, even though he was well-qualified and could perform the work within his restrictions. He also complained to her about the way UCOR Safety Representative Chris Brudecki was treating him because of his disability—demeaning Mr. Hicks in front of other employees by accusing him of faking his injury, his restrictions, and his need for accommodation.

32. On April 3, 2018, Mr. Hicks was moved to the Technetium 99 Pad (Tc-99) project, which is known by workers as an undesirable assignment.[1] While working in the Tc-99 area, Mr. Hicks complained to his Foreman Jesse Boles and General Foreman Steven Tinker, that he was denied the WPS job because of his injury and medical restrictions, that Brudecki was harassing him because of his medical impairment, and that he was being instructed to hang out in the "Conex box," a trailer set up at the worksite, where there was no work to do, even though work was available that he could perform with or without accommodation for his disability.

33. During this time and throughout the summer of 2018, Mr. Hicks also began making protected disclosures to Boles and Tinker about health and safety concerns and violations he observed at the site. As an asbestos certified supervisor, he observed improper asbestos handling

---

[1] The Tc-99 project involved excavating debris containing hazardous waste from a demolished building, loading the debris onto dump trucks, securing the loads with tarps, and transporting to a disposal site.

and reported that along with the lack of required changing and shower facilities for employees who work with hazardous materials in violation of OSHA regulations. *See* 29 C.F.R. §§ 1910.141(d) and 1910.141(e).

34. As the heat intensified in the summer months, Mr. Hicks complained about laborers being pressured by management to work in unsafe conditions contrary to training, such as to continue working, rather than take a break, when experiencing heat stress and elevated heart rates.

35. Mr. Hicks made these complaints and expressed his concerns to Mr. Tinker and Mr. Boles on a regular basis during various discussions. Although Mr. Tinker expressed similar concerns, he told Mr. Hicks he was powerless to change anything.

36. During this time, Mr. Hicks began reporting some of these same safety concerns to Industrial Hygiene Manager Caren Sedlacek, as well as reporting the mistreatment and retaliation he was experiencing because of his disability. Ms. Sedlacek's job involved answering questions and providing information about workplace safety issues. She advised Mr. Hicks to speak with the UCOR Human Resources department, and she gave him the contact information for that office as well as contact information for Dan Macias, the General Plant and Capital Asset Projects Manager.

37. Mr. Hicks began calling Mr. Macias on or about August 28, 2018, and finally got in touch with him on or around September 18, 2018. Mr. Hicks met with Mr. Macias in his office on or about September 18, 2018, for approximately an hour to discuss his concerns.

38. Mr. Hicks complained to Mr. Macias about being denied the Waste Packaging job because of his injury and medical restrictions, being instructed to hang around in the Conex box with no work to do when work was available within his restrictions or with accommodations, and about UCOR's Safety Representative harassing him because of his injury, impairment, and restrictions.

39. Mr. Hicks also reported to Mr. Macias during their meeting his concerns regarding

7

the Tc-99 project, including, for example: (1) that the asbestos areas were not being properly flagged; (2) that shower and change houses were not available in close enough proximity for employees to use them; and (3) that workers were not leaving the worksite when suffering from heat stress due to alleged threats from Area Superintendent Jimmy Hughes.

40. Mr. Macias told Mr. Hicks that he did not want to get involved because Mr. Hicks's situation could be a "big legal mess" and UCOR had Human Resources personnel who handled the types of complaints Mr. Hicks was making. Mr. Macias told Mr. Hicks that he would contact Human Resources and UCOR's HR representatives would contact Mr. Hicks about his complaints.

41. After leaving the meeting with Mr. Macias, Mr. Hicks was confronted by Mr. Boles and another foreman, Shawn Humphries, stating that Superintendent Hughes had been looking for Mr. Hicks and they demanded to know where Mr. Hicks had been and what complaints he had made to Mr. Macias. When Mr. Hicks approached Superintendent Hughes in his vehicle to ask why he was looking for him, Mr. Hughes acted irritated toward Mr. Hicks, claimed it was Mr. Humphries who was looking for him, then angrily punched the accelerator and drove away.

42. The day after his meeting with Mr. Macias, Mr. Hicks was suddenly informed that he could no longer work at the truck stands on the Tc-99 project.[2]

43. When Mr. Hicks was first assigned permanent restrictions in July 2018, UCOR had approved him to work at the truck stands, which did not require frequent lifting or repeated bending. This position also allowed him opportunities to work overtime, which Mr. Hicks routinely accepted when available. Mr. Hicks had been working the truck stands without difficulty or incident for several weeks, but after his meeting with Mr. Macias, his supervisors informed him

---

[2] Truck stands are platforms set sufficiently apart that a dump truck can drive between them. Mr. Hicks's work on the truck stands consisted of removing and replacing tarps used to secure hazardous waste from escaping the trucks and otherwise preparing the trucks to carry their loads.

8

that, due to his restrictions, he was no longer allowed to work the truck stands.

44. In the aftermath of Mr. Hicks's meeting with Mr. Macias, Mr. Hughes began making more comments about "troublemakers" among the staff, who would be sent to the Biology project at Y-12 (a generally undesirable worksite) if they did not like the way things were done at Tc-99. Mr. Hicks understood these comments to be directed toward him.

45. Additionally, Mr. Hicks became aware that UCOR was allowing his certifications and trainings to expire. In the past, UCOR ensured that Mr. Hicks, like other employees, was scheduled for trainings and that his certifications were timely renewed, but they suddenly stopped doing so. Instead, he had to personally go to the Training Department to request classes/certifications. The training representative confirmed to Mr. Hicks that his classes and certifications should have automatically populated for renewal when the refresher dates were due.

46. In February 2019, another WPS position opened, for which Mr. Hicks applied. Around the same time, he contacted UCOR's Human Resources department to discuss his concerns about his future at UCOR considering how he had been treated since reporting his injury and physical impairment.

47. When Mr. Hicks met with Carolyn Simcox and another Human Resources representative in February 2019, he explained to them that he believed he had been "blacklisted" by UCOR not only because of his disability but also in retaliation for complaining about discrimination and workplace safety issues. He told them he was being denied jobs and work assignments that he could perform within his restrictions.

48. Mr. Hicks also asked them whether Mr. Macias had spoken to the Human Resources department about the concerns he had expressed to Mr. Macias, and they said he had not. They did not indicate that they could or would investigate Mr. Hicks's complaints or that they would do anything to help him. Instead, they told Mr. Hicks that it was acceptable for hiring

9

managers to reject him because of his restrictions. When Mr. Hicks complained that there was available work he could perform within his restrictions, they dismissed his concerns that UCOR was discriminating and retaliating against him.

49. Not long after Mr. Hicks's meeting with Human Resources, a new General Foreman, Jeff Newport, was hired as his supervisor. Mr. Newport was aware of Mr. Hicks's disability and restrictions and told Mr. Hicks he could not assign him to work various jobs due to his medical condition and restrictions. Mr. Newport exhibited hostility toward Mr. Hicks from the start, such as yelling at him in front of other employees. During morning meetings, Mr. Newport regularly threatened to move people who "caused problems" to the Biology project. Mr. Newport assigned Mr. Hicks to the Conex box with no work to do even though work was available that Mr. Hicks could perform.

50. On the afternoon of March 12, 2019, Mr. Newport instructed Mr. Hicks to report to the Biology project at Y-12 the next day.[3] He did not give Mr. Hicks a reason for the transfer, and when Mr. Hicks reported to the Biology project the next day, the supervisors had no idea why he was there or who had sent him. They told Mr. Hicks that no one with restrictions was permitted to work there. The primary work available on the Biology project was asbestos abatement, in which Mr. Hicks had twenty years of experience. He was able to perform that work with or without accommodations for his restrictions.

51. Mr. Hicks reported back to Tech-99 the next day, March 14, 2019, but Mr. Newport told him he was not permitted to work the truck stands or do any other work there. Instead, Mr. Hicks was ordered to remain in the Conex box. Mr. Hicks was effectively "benched" from work,

---

[3] The Biology unit was responsible for demolition and hazardous waste remediation within a building at the Y-12 complex.

even though he was ready, willing, and able to work.

52. After Mr. Hicks was ordered to go to the Biology project and then back to Tech99 but not permitted to actually work, he contacted the DOE's Office of Civil Rights about the discrimination and retaliation he had faced at UCOR. He left a voicemail on the morning of March 14, 2019, and followed up with an email message on March 17 to civilrights@Hp.Doe.gov to describe some of the discrimination and retaliation he had faced at UCOR.

53. On March 19, 2019, Mr. Hicks was called into UCOR Human Resources concerning an unrelated matter. During that meeting with HR Managers Mary Alice Douglas and Carolyn Simcox, Mr. Hicks was asked whether he felt he could go to upper management with any concerns. Mr. Hicks responded that he did not feel comfortable doing so because he had already tried, his concerns were not addressed, and he suffered retaliation as a result.

54. Specifically, Mr. Hicks expressed his frustration that he had reported various concerns to Dan Macias but received no follow-up from HR as Macias had promised and was subjected to further retaliation after the meeting with Macias. He reiterated some of the previously disclosed safety concerns and discriminatory treatment, and Ms. Douglas told him they would be in contact with him about that later. At that point, Mr. Hicks disclosed to them that he had already taken his concerns "outside" of UCOR.

55. After the meeting with HR, Ms. Simcox approached Mr. Hicks while he was waiting for his ride back to the work site and reassured him that Ms. Douglas would be reaching out to him soon to address his complaints, including UCOR's failure to accommodate his restrictions.

56. On March 21, 2019, Mr. Hicks again called the Office of Civil Rights. He was informed that it was no longer handling such complaints, but that his complaint would be forwarded to UCOR for investigation there. Mr. Hicks was referred to the EEOC regarding his

11

disability discrimination complaint, and he immediately called the EEOC.

57. On Friday, April 12, 2019, Mr. Hicks observed improper dumping of potentially contaminated rainwater, which he reported to the foreman and other crew members on the project. The foreman told Mr. Hicks it was not his concern. He later reported the incident to Ms. Sedlacek, the industrial hygienist. Mr. Hicks also took video footage of the illegal dumping.

58. The following Monday, April 15, 2019, UCOR transferred Mr. Hicks to the Housekeeping Department.[4] The reason given was not related to his restrictions. Rather, he was told that UCOR management decided to separate family members working together on the same project. General Foreman Shane Kilby told Mr. Hicks that UCOR Human Resources had called the Area Superintendent directing that Mr. Hicks be transferred because his father worked with him on the Tc-99 project.

59. No one talked to Mr. Hicks about alternative locations, job assignments, or duties he could perform within his restrictions. Nor did anyone ask whether his father was willing to transfer. Instead, he was told to report to Housekeeping the next day, even though other family members continued to work together.

60. On April 16, Mr. Hicks reported to the housekeeping office. He met with the Superintendent, Stan Moore, and discussed his disability-related restrictions. Mr. Hicks explained that he was able to do a wide range of activities despite his restrictions. Mr. Hicks worked in Housekeeping for less than two days when he was called into Mr. Moore's office and discharged.

61. On April 17, 2019, UCOR terminated Mr. Hicks's employment at a meeting attended by Area Superintendent Stan Moore, UCOR Human Resources Manager Mary Alice Douglas, and a union steward from Laborers' International Union of North America, Local Union

---

[4] The Housekeeping unit supports other units by transporting supplies, providing water, cleaning surfaces, and performing other tasks.

12

818. Mr. Hicks recorded the meeting.

62. Superintendent Moore informed Mr. Hicks that UCOR was discharging him because "the project has determined that we're not going to accommodate your restrictions." Mr. Hicks responded to Moore's explanation by stating that "it's kinda funny that I brought up concerns and questions, and all this right here is playing out." He expressed skepticism about the stated reason for his discharge, saying "I brought up multiple things and it's kinda obvious what this is" and "it's kinda funny that I'm able to do truck stands and everything else for the last almost year now, then all of a sudden I'm no longer allowed to be over there, to this right here" referring to his discharge.

63. HR Manager Douglas and the union rep remained silent. Ms. Douglas did not question or deny Mr. Hicks's assertions because she was one of many UCOR officials to whom Mr. Hicks had recently made protected disclosures and reported retaliation. Likewise, HR manager Carolyn Simcox had direct knowledge of his protected disclosures but signed his Separation Notice before the termination meeting without even talking to Mr. Hicks about his ability to perform housekeeping duties.

64. Mr. Hicks did not complain about the housekeeping job and performed his duties without any problems. No attempt was made to assign Mr. Hicks to another job or department. There was no discussion or "interactive process" to determine whether UCOR could accommodate his medical restrictions within the Housekeeping Department or any other UCOR Department.

65. UCOR's HR Managers knew that Mr. Hicks was well-qualified for open jobs, including but not limited to the open Waste Packaging Specialist (WPS) job for which he recently applied and could perform the work within his restrictions.

66. There was no conversation about transferring him back to his most recent job; transferring his father to another location; assigning him to the open WPS job; or transferring him

13

to any of the jobs he had performed within his restrictions over the past 18 months since his injury, such as traffic control, truck stands, or fire watch.

67. UCOR employs more than 2,000 employees at the Oak Ridge Reservation, yet it suddenly claimed to have no work within Mr. Hicks's restrictions.

68. During the termination meeting, Superintendent Moore referred to the decisionmakers as "we," using phrases like, "we've discussed it," "the project determined," "it's a business decision by the project," and "your health is important to us the Company, and we gotta make Company decisions."

69. Mr. Moore also stated, "I don't hire anyone with a limitation," and "if they got a limitation … they don't make it in the gate." Although such a blanket discriminatory policy or practice violates laws like the ADA, UCOR's HR Manager again remained silent in response to Mr. Moore's blatant discriminatory statements.

70. Indeed, UCOR's HR managers, including Ms. Douglas, had previously told Mr. Hicks during their meeting in February 2019 that UCOR allows its hiring managers to reject workers for hire based on medical restrictions, regardless of a worker's ability to perform the essential job functions with or without accommodations.

71. UCOR maintains a policy, pattern, and practice of refusing to accommodate individuals with physical impairments, disabilities, or medical restrictions.

72. UCOR maintains a policy, pattern, and practice of refusing to hire and/or firing individuals who need or request accommodations for physical impairments, disabilities, or medical restrictions.

73. In addition to complaining about disability discrimination, failure to accommodate, and retaliation, Mr. Hicks made specific protected disclosures about health and safety concerns and violations that contributed to UCOR's decision to discharge him.

74. Specifically, examples of protected disclosures about health and safety violations made by Mr. Hicks to UCOR supervisors and managers include: (a) employees on the Tech 99 project being at risk of heat stress related injuries due to UCOR managers denying or discouraging necessary breaks; (b) improper asbestos abatement; (c) improper dumping of potentially contaminated rainwater; (d) risk of injury to employees directed to climb an oversized dirt pile; (e) improper disposal of water used to clean trucks used for asbestos removal; (f) lack of adequate personal protective equipment (PPE) or cleaning facilities for employees cutting pipes containing asbestos; (g) failure to maintain dikes used to contain contaminated waste water; and (h) failure to properly flag hazardous areas with asbestos-containing debris.

75. At the termination meeting, UCOR provided Mr. Hicks with a signed Separation Notice. The notice reflected the reason for separation as "discharge" rather than "lack of work," thereby undermining his ability to obtain unemployment compensation, as well as future employment.

76. When Mr. Moore asked Mr. Hicks if he wanted to comment or consider an exit interview, Mr. Hicks expressed frustration about the futility of doing so, stating, "nah, I've already tried talking to everybody I can out here, but nobody seems to care, so this right here is what you get."

77. In conjunction with discharging him, UCOR terminated his security clearance and coded him as unable to meet site access requirements, thereby intentionally restricting his ability to work for other employers on the Oak Ridge Reservation.

78. After his discharge, Mr. Hicks filed a charge of disability discrimination with the EEOC. The EEOC issued a determination finding that UCOR violated the ADA when it denied Mr. Hicks reasonable accommodations, discharged him, and retaliated against him.

79. Mr. Hicks also filed a whistleblower complaint with the Department of Energy's

Office of Inspector General (OIG). On July 14, 2023, the OIG issued its decision finding that Mr. Hicks's protected disclosures about health and safety violations were contributing factors in UCOR's decision to terminate his employment, even though UCOR also fired him because of his disability.

80. As a direct result of UCOR's discriminatory and retaliatory employment practices, Mr. Hicks has experienced harm, including humiliation, indignity, anxiety, emotional distress, damage to his reputation and future earning capacity, and substantial economic losses, including lost earnings, benefits, expenses, and attorney's fees.

81. UCOR's actions against Mr. Hicks described herein were carried out willfully, intentionally, maliciously, and/or with reckless indifference to his rights under the law.

## CAUSES OF ACTION

### Count 1: Failure to Accommodate

82. Mr. Hicks re-alleges and incorporates the preceding paragraphs.

83. Mr. Hicks is a qualified individual with a disability, as defined by the ADA, 42 U.S.C. §§ 12102, 12111.

84. UCOR could have provided Mr. Hicks with a reasonable accommodation for his known disability without imposing undue hardship on the conduct of its business.

85. UCOR failed to engage Mr. Hicks in an interactive process to identify a reasonable accommodation for his known disability.

86. UCOR's failure to accommodate Mr. Hicks constitutes disability discrimination, in violation of the ADA.

87. UCOR discriminated against Mr. Hicks intentionally. UCOR acted maliciously and/or with reckless indifference to Mr. Hicks's rights.

## Count II: Discriminatory Discharge

88. Mr. Hicks re-alleges and incorporates the preceding paragraphs.

89. Mr. Hicks is a qualified individual with a disability, as defined by the ADA, 42 U.S.C. §§ 12102, 12111.

90. UCOR discharged Mr. Hicks because of his disability, in violation of the ADA.

91. In addition to direct evidence of disability discrimination, the reasons offered by UCOR to justify its harassment and adverse actions against Mr. Hicks are a pretext to mask its true discriminatory motives.

92. UCOR discriminated against Mr. Hicks intentionally, maliciously, and/or with reckless indifference to Mr. Hicks's rights.

## Count III: Retaliation

93. Mr. Hicks re-alleges and incorporates the preceding paragraphs.

94. In retaliation for his protected activities, UCOR harassed Mr. Hicks and took materially adverse actions against him that would dissuade a reasonable worker from asserting his rights or making a charge of discrimination.

95. UCOR harassed and discharged Mr. Hicks in retaliation for his requests for reasonable accommodation, assertion of his rights, and/or for opposing illegal discrimination.

96. UCOR's actions constitute unlawful retaliation in violation of the ADA.

97. UCOR retaliated against Mr. Hicks intentionally, maliciously, and/or with reckless indifference to Mr. Hicks's rights.

**Count IV: Violation of the National Defense Authorization Act's Enhancement of Contractor Protection from Reprisal for Disclosure of Certain Information, 5 U.S.C. § 1221(e)(1), incorporated by 41 U.S.C. § 4712(c)(6)**

98. Mr. Hicks re-alleges and incorporates the preceding paragraphs.

99. UCOR's actions constitute unlawful retaliation in violation of 41 U.S.C. 4712(a).

100. Mr. Hicks made protected disclosures as defined in 41 U.S.C. § 4712(a), 5 U.S.C. § 2302(b)(8)(A), 5 U.S.C. § 1221(e)(1), incorporated by 41 U.S.C. § 4712(c)(6), and 10 C.F.R. 708.5.

101. UCOR decisionmakers were aware of Mr. Hicks's protected disclosures.

102. UCOR retaliated against Mr. Hicks for reporting conditions on the worksite that he reasonably believed were evidence of gross mismanagement of a federal contract, a gross waste of federal funds, an abuse of authority relating to a federal contract, and/or constituted substantial and specific danger to employees and to public health or safety related to a federal contract.

103. These protected disclosures were a contributing factor in UCOR's decision to terminate Mr. Hicks.

104. UCOR cannot demonstrate by clear and convincing evidence that it would have discharged Mr. Hicks in the absence of such disclosures. 5 U.S.C. § 1221(e)(2).

105. UCOR cannot demonstrate by clear and convincing evidence that it had a legitimate, nondiscriminatory reason for discharging Mr. Hicks.

106. UCOR retaliated against Mr. Hicks in violation of the NDAA-ECP intentionally, maliciously, and/or with reckless indifference to Mr. Hicks's rights.

## PRAYER FOR RELIEF

Wherefore, Mr. Hicks requests that the Court grant him the following relief:

A. Enter judgment for Mr. Hicks against UCOR; declare that UCOR's actions violate the ADA and the NDAA-ECP; and enjoin UCOR from further unlawful discriminatory and retaliatory practices.

B. Order UCOR to make whole Mr. Hicks by providing appropriate backpay with

prejudgment interest, in an amount to be determined at trial, and other affirmative relief necessary to eradicate the effects of its unlawful employment practices, including an appropriate amount to offset increased tax consequences of any lump sum payment.

C. Order UCOR to pay Mr. Hicks his front pay and the value of future lost benefits or, in the alternative, order that Mr. Hicks be reinstated to an appropriate position with UCOR.

D. Order UCOR to pay Mr. Hicks compensatory damages in an amount to be determined by a jury.

E. Order UCOR to pay Mr. Hicks punitive damages in an amount to be determined by a jury.

F. Order UCOR to pay all costs, disbursements, pre-judgment interest, post-judgment interest, expert witness fees, and reasonable attorneys' fees as allowed by law.

E. Award Mr. Hicks the costs of bringing this action.

G. Grant such further relief as the Court deems just, proper, and equitable.

## JURY TRIAL DEMAND

Mr. Hicks requests a jury trial on all questions of fact raised by his Complaint.

Respectfully submitted,

s/ *Jennifer B. Morton*
Jennifer B. Morton, BPR #015585
Summer H. McMillan, BPR #020296
**JENNIFER MORTON LAW, PLLC**
8217 Pickens Gap Road
Knoxville, TN 37920
(865) 579-0708
(865) 579-0787 (fax)
jen@jmortonlaw.com
summer@jmortonlaw.com